Harold S. **HEMSTREET**, Plaintiff,

v.

**BURROUGHS CORPORATION**, a corporation, and **Harris Trust and Savings Bank**, a corporation, Defendants.

No. 81 C 6412.

United States District Court, N.D. Illinois, E.D.

Jan. 30, 1987.

Opinion on Motion for Reconsideration July 7, 1987.

Jerold A. Jacover, William, Brinks Olds, Hofer, Gilson & Lione, Ltd., Leonard M. Ring, Leonard M. Ring and Associates, Edward D. Manzo, Jenner & Block, Chicago, Ill., for plaintiff.

Steven D. McCormick, Kirkland & Ellis, Chicago, Ill., Charles W. Bradley, Steven D. Glazer, Davis, Hoxie, Faithfull & Hapgood, New York City, L. Michael Jarvis, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Plaintiff Harold S. Hemstreet brings this action against defendants Burroughs Corporation and Harris Trust & Savings Bank, for patent infringement. Plaintiff is the owner of United States Patents Nos. 3,713,-099 ('099 patent) and 3,713,100 ('100 patent). Both patents have the same title: "Method and Apparatus For Identifying Letters, Characters, Symbols, and the Like." The patents deal generally with character recognition. Defendant Burroughs manufactures a wide range of business equipment. Plaintiff alleges that all of the products that read characters which are made, sold, or leased by Burroughs infringe at least one of his two patents.[1] Defendant Harris Bank leased and used character readers made by Burroughs for purposes of check sorting between 1973 and 1981.

Although the patents include scores of claims directed to various aspects of the character recognition process, it is useful to briefly review the process as it is described in the introduction to the patents and illustrated in the diagrams that accompany the patents.[2] In one embodiment of the invention, a train of electrical pulses is produced by scanning an unknown character with a series of parallel vertical beams. (See Appendix Fig. 2.) A pulse is created each time a beam passes an edge of the character—i.e., passes from the light background to the dark body of the character or vice versa. (See Figs. 2b and 5.) This train of pulses is representative of the unknown character. It is then compared on the basis of time coincidence with trains of pulses that have been previously generated for a set of known characters (e.g., the letters of the alphabet) and stored on some memory device. During the comparison process, those pulses of the known and unknown characters that are coincident in time are ignored, while those pulses that are not coincident are counted. The comparison of the unknown character with each of the known characters thereby produces a total that is representative of the perceived differences between the two. By comparing these totals, the known character that is the "best match"—i.e., has the lowest total "difference count"—can be determined, which in turn represents the most likely identity (i.e., letter or other symbol) for the unknown character.

1. Plaintiff asserts that the accused products infringe claims, 22, 24, 26, 27, 32, 34, 66, 74, 76, 78, 79, and 92 of the '099 patent and claims 15, 16, 17, 19, 20, and 39 of the '100 patents.

2. The diagrams reflect two different embodiments of the invention and are the same for both the '100 and '099 patents.

Because of the technical and complex nature of the subject matter of the patents in suit, the court requested that the parties nominate and agree on the appointment of a court expert to assist the judge and any jury with respect to complex technical matters on which the parties' experts might disagree. Pursuant to Rule 706 of the Federal Rules of Evidence, the court appointed Professor Andre G. Vacroux of the Illinois Institute of Technology. Professor Vacroux has reviewed the extensive materials submitted in support of and in opposition to the motion for summary judgment. However, he was not asked for and has not rendered any findings or opinion with respect to the merits. His function was to review the court's description of the circuitry described in this opinion to determine whether from a technical point of view it is accurately described.

Plaintiff originally filed a single patent application in 1953. The '100 patent issued from that application directly, while the '099 patent issued from a divisional application based upon subject matter divided out of the 1953 application. The 1953 application was prepared and filed by Robert I. Williams, an attorney engaged by plaintiff. In 1955 plaintiff assigned the application to Link Aviation, Inc., and arranged to have the application file transferred to the patent attorneys for Link. The attorneys for Link who worked on the application were Richard G. Stephens and Irving Kayton. In 1959 the Link attorneys filed a divisional application which became the '099 patent. Some time later Link was acquired by General Precision, Inc., and General Precision was subsequently acquired by the Singer Company. The patents issued to Singer on January 23, 1973, twenty years after the original application was filed. Some time after the patents were issued, plaintiff filed suit against Singer and the patents were assigned to plaintiff as part of a settlement. Two examiners of the Patent and Trademark Office ("PTO") were primarily responsible for examining the Hemstreet applications during part of the application process. Kenneth L. Miller served as an Assistant Examiner with the PTO from July, 1953, until December, 1955, and handled the Hemstreet application from the time the application was filed until he left the PTO. Thomas A. Robinson served with the PTO from 1946 to 1948 and from 1963 to 1982, and was designated a Primary Examiner in 1968. The Hemstreet applications were assigned to him in 1971 and he was the examiner who eventually allowed the patents to issue in 1973.

Defendants have now moved for summary judgment on the issues of (1) inequitable conduct and (2) noninfringement. Because summary judgment is granted on the ground of inequitable conduct, it is unnecessary to address the issue of noninfringement. Defendants argue that plaintiff engaged in inequitable conduct by failing to disclose certain prior art to the PTO and by making false and misleading statements to the PTO with regard to prior art. Their argument focuses primarily on four items of prior art: (1) certain parts of a text entitled "High-Speed Computing Devices"; (2) the Hillyer Patent No. 2,679,636; (3) the King Patent No. 3,469,263; and (4) the Shepard Patent No. 2,663,758. Defendants contend that each of these instances of inequitable conduct independently renders plaintiff's patents unenforceable.

### Applicable Law

Summary judgment can only be granted where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Peterson Mfg. Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 1546 (Fed.Cir. 1984). When that can be shown, however, summary judgment is as appropriate in a patent case as in any other. *Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir. 1985); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). The Federal Circuit explained in *Barmag:*

> Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources....

> A critical factor in a motion for summary judgment in a patent case, as in any other, is the determination by the court that there is no *genuine* issue of *material* fact. With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged.... The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere deni-

als or conclusory statements are insufficient.

On the other hand, the established facts, as well as any inferences of fact drawn from such facts, must be viewed in a light most favorable to the opposing party.

731 F.2d at 835–36.

■ Because of limitations on the time and facilities available to the PTO to search for prior art relevant to pending applications for patents, the PTO must rely heavily on the representations of patent applicants. Every patent applicant therefore has a duty of disclosure to the PTO. This duty is summarized in 37 C.F.R. § 1.56(a):

A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

Failure to disclose material information, or submission of false material information, with an intent to mislead, constitutes "inequitable conduct" and renders the patent unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559–60 (Fed. Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

■ Determining whether inequitable conduct has occurred requires an analysis of two factors, the level of materiality of the information involved and the level of culpability shown, which are related to each other in the final determination. *As* the court said in *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (quoting *Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 716 (1st Cir.1981)):

Questions of 'materiality' and 'culpability' are often interrelated and intertwined, so that a lesser showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of withheld information would necessarily create an inference that its nondisclosure was 'wrongful.'

Deciding whether inequitable conduct occurred requires a three-step analysis: First, it must be determined whether a "threshold materiality" has been shown. Second, the same must be done for "threshold intent." Finally, assuming both thresholds have been met, these two factors must be "balanced." *J.P. Stevens, supra,* 747 F.2d at 1559–60. Proof of both materiality and intent must be by clear and convincing evidence.

Threshold materiality can be established by any of four tests: (1) objective "but for"; (2) subjective "but for": (3) "but it may have been"; and (4) PTO Rule 1.56(a), *i.e.,* whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. *J.P. Stevens, supra* at 1559; *American Hoist, supra,* 725 F.2d at 1362. These standards are listed in order from the highest and strictest "but for" standards to the lowest and broadest, yet still sufficient, standard as stated in Rule 1.56(a).

■ Threshold intent does not require proof of deliberate scheming; gross negligence is sufficient. *J.P. Stevens, supra,*

747 F.2d at 1560; *Hycor Corp. v. The Schlueter Co.,* 740 F.2d 1529, 1540 (Fed. Cir.1984). Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of withheld reference. *J.P. Stevens,* 747 F.2d at 1560; *Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984). On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. *J.P. Stevens,* 747 F.2d at 1560; *Orthopedic Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383 (Fed.Cir.1983). Inequitable conduct need not be proven with direct evidence and may be proven by showing acts the natural consequences of which are presumably intended by the actor. *J.P. Stevens,* 747 F.2d at 1560; *American Hoist, supra,* 725 F.2d at 1363.

■ Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. *J.P. Stevens,* 747 F.2d at 1560; *American Hoist,* 725 F.2d at 1364. The showing of an intent to deceive necessary to support a finding of inequitable conduct varies inversely with the materiality of the information alleged to have been withheld from the patent office. *American Hoist,* 725 F.2d at 1363.

### I. "High Speed Computing Devices" Text

■ Defendants argue that plaintiff's failure to cite pages 271–72 of the published text, "High-Speed Computing Devices," to the PTO as prior art constitutes inequitable conduct. Page 272 of the High Speed text shows a "half-adder" circuit[3] (labeled Fig. 13–4 in the High-Speed text) which is discussed in the text. This circuit, generally speaking, is one having two inputs, A and B, and one output, and produces an output signal whenever it receives

a signal through either input A or input B but not when it receives input signals through both inputs A and B at the same time (or, of course, from neither).

As described above, plaintiff's identification process involves the comparison of a train of pulses representative of the unknown character with other trains of pulses representative of known characters. The comparison process proceeds by counting only those pulses from one or the other train (the known or the unknown character) that do *not* coincide in time with a pulse from the other train. Each such pulse thereby represents a difference between the two characters. Figure 6 from the patents is "a diagram of an 'or-not-and' circuit, for comparing the separate quantities." ('100 patent, col. 3, lines 4–5; '099 patent, col. 2, lines 44–45.) Plaintiff also explains:

> For comparison procedures, I have, moreover, provided an anti-coincidence device, which will note or indicate lacks of time-coincidence between a plurality of pulse trains but which will make no note and give no indication when the pulses of such plurality are substantially coincident in time.

('100 patent, col. 2, lines 34–40.) In Figure 6 of the patents the circuit feeds into a counter for counting the differences.

On March 21, 1952, plaintiff sent his attorney, Robert Williams, a detailed description of his proposed device which included an "or-not-and" circuit (described by plaintiff at that time as an "either, or, but not both" circuit) and labeled as Figure 4 in his disclosure. Plaintiff subsequently ran across the High-Speed text in the course of his research. On August 19, 1952, plaintiff again wrote to Williams explaining that he had been doing some "digging and research" and that "[i]n the process I ran across some ideas which make me want to delete Fig. 4 and the 'either, or but not both' circuit of my earlier description and

---

**3.** Other terms are also used to describe the part of that circuit relevant to this case, including "or-not-and" circuit, "exclusive or" circuit, and "anti-coincidence" circuit.

substitute Fig. 104 and the description of it given in supplement # 2." Supplement # 2 was attached to the August 19 letter, contained Fig. 104, and stated, in relevant part:

This circuit of Fig. 104 seems superior to that of Fig. 4 for several reasons including the following:

1. It rather closely follows established techniques as may be seen by examination of page 272, "High-Speed Computing Devices." This should be of value in getting the application through the Patent Office since there should be little argument regarding whether or not such a circuit will work.

Supplement # 2 concludes:

While the circuit of Fig. 104 is better and corresponds more to current practice in the art than the original circuit of Fig. 4, there is probably little in the circuit of Fig. 104 which is patentable. However, the circuit of Fig. 104 should make the automatic reader somewhat more reliable, even though the circuit of Fig. 104 is not itself patentable.

On November 17, 1952, after Williams had supplied plaintiff with a draft patent application, plaintiff wrote to Williams, saying:

I have some doubt as to how much will be allowed in my claims bearing on the or-not-and circuit alone since this general technique has been used in the digital computer field. See, for example, Figs. 13–3 and 13–4 (pg. 271, 272) of 'High-Speed Computing Devices.' Here the or-not-and technique is used as part of a digital computer adder.

Neither plaintiff nor his attorney, Williams, ever called pages 271–72 of the High-Speed text to the attention of anyone at the PTO, either when the patent application was first filed, in 1953, or at any later point in the twenty year history of the application process, nor did any other attorney who worked on the patent application.

The original application contained one claim—original claim 31—that defendants contend was fully anticipated by the circuit shown on page 272 of the High-Speed text, and 12 claims, numbered 19–25 and 32–36, that are directed to an or-not-and circuit plus a counter. Claims 19–25 and 33–36 eventually became claims 1–11, respectively, of the '100 patent.

In an office action dated May 20, 1955, Examiner Miller ruled that claims 19–25 and 32–36 were considered allowable, without citing any prior art against these claims, and without the circuit from page 272 having been called to his attention. Many years later these claims were allowed by Examiner Robinson as claims 1–11 of the '100 patent. Application claim 31 was disallowed in 1955.

In 1955 the patent application was transferred to Link Aviation and the original application papers were transferred to Stephens, the Link attorney. In 1963 Stephens copied four claims involving an or-not-and circuit from Dobbie Patent No. 3,107,306. The Dobbie patent had been applied for in 1959 and issued to J. Dobbie in 1963. The examiner declared the interference, and the claims were ultimately won by plaintiff. The High-Speed text had not been cited against the Dobbie claims before they were copied, and Stephens did not cite the High-Speed text during the interference proceedings. Those claims are now claims 45 to 48 of the '100 patent.

The first step in deciding whether plaintiff's failure to disclose pages 271–72 of the High-Speed text to the patent office constitutes inequitable conduct is to determine whether the High-Speed text meets any or all of the threshold tests of materiality discussed in *American Hoist, supra.* In this case that step is unusually simple and straightforward: the High-Speed text meets the "subjective 'but for' standard." The subjective "but for" standard requires a showing that the PTO examiner would not have allowed the application if he had known the facts in question—in this case if he had known of the relevant pages of the High-Speed text. *Plastic Container Corp. v. Continental Plastics,* 607 F.2d 885, 899 (10th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Gem-*

*veto Jewelry Co. v. Lambert Bros, Inc.*, 542 F.Supp. 933, 940–41 (S.D.N.Y.1982). Examiner Miller states in his affidavit that the High-Speed text is closer than any prior art he knew of to '100 patent claims 1 to 11, that he was not aware of the High-Speed text at the time he considered plaintiff's application, and that if he had been aware of the High-Speed circuit he would not have allowed claims 1 to 11 of the '100 patent. He also states that application claim 31 was fully anticipated by the High-Speed circuit. Examiner Robinson testified in his deposition that at the time he handled the Hemstreet applications he was not aware of the relevant High-Speed pages or of the circuit shown on those pages, that those pages were material to his examination of claims 1 to 11 and important to his decision as to whether or not to allow those claims, and that he would not have allowed claims 1 to 3 of the '100 patent if he had known of pages 271–72 of the High-Speed text. Thus pages 271–72 of the High-Speed text satisfy the subjective "but for" standard of materiality as to claims 1 to 3 on the basis of both Examiner Miller's and Examiner Robinson's testimony.[4] Furthermore, Robinson's testimony is clear and convincing proof that pages 271–272 meet the lower standards of materiality as to claims 4 to 11.[5]

There is also clear and convincing evidence of the threshold intent required. It is undisputed that both plaintiff and his attorney knew of the High-Speed text. Plaintiff believed it to be highly material to certain aspects of his patent and consciously and deliberately incorporated techniques disclosed in the High-Speed text into his patent. He also doubted whether his claims bearing on the or-not-and circuit alone would be allowed because of the use of that technique in the computer field, and specifically referred to the High-Speed text as an example of such prior use. He explained all of this to his attorney, Williams. Plaintiff then failed to call the High-Speed text to the attention of the patent office, even though his patent application included several claims that would not have been allowed but for plaintiff's failure to disclose the High-Speed text. This constitutes clear and convincing evidence that plaintiff intended to deceive the patent office.

Plaintiff argues that claims 1 to 11 are distinguished from High-Speed by combining the or-not-and circuit with a counter. However, patent applicants are required to disclose any information "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a) (1983); *American Hoist, supra*, 725 F.2d at 1362. After having acknowledged concern as to the patentability of his claims addressed to or-not-and circuits because of prior art such as High-Speed, plaintiff now attempts to argue that he considered High-Speed unimportant as to claims 1–11 because of the addition of the counter. The patent holder made a similar argument in *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10 (Fed.Cir.), *cert.*

---

**4.** Examiner Miller is now a Vice-President of defendant Burroughs. Plaintiff challenges his testimony on that basis but raises no challenge to Robinson's testimony.

**5.** Issues of fact exist as to claims 45–48 which would preclude granting summary judgment based on *those* claims. Examiner Robinson testified that he would not have allowed those claims if he had been aware of the High-Speed text but relied on the circuit on page 275 as well as pages 271–72. Therefore it is not clear what standard of materiality is satisfied by pages 271–72 alone as to claims 45–48. Defendants argue that pages 271–72 alone satisfy a high degree of

materiality because claims 45–48 read on the circuit shown on page 272 if cathode follower stages are added to that circuit and it was obvious to add them. However, an issue exists as to whether it was obvious by 1951 to add such cathode follower stages. Furthermore, it is not clear to what extent plaintiff's attorneys were aware of page 275. Although plaintiff was certainly familiar with this page in 1952 when he wrote to Williams about pages 271–72, it is not clear whether Stephens and Kayton, who copied claims 45–48 from the Dobbie patent in 1963, were aware of its significance, especially since it was not mentioned in the original correspondence.

*denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). The court rejected that argument, stating:

> If [the patentee] considered his claims sufficiently narrow to be clear of the [prior art], the examiner, and not he or 'others skilled in this art,' was the person to decide whether [the patentee's] original claims had been patentable over [the prior art].

*Id.* at 13 (quoting *In re Clark,* 522 F.2d 623 (CCPA 1975)). It was the examiner's place to decide whether claims 1–11 were distinguished from High-Speed.

Furthermore, the patent office cited a prior art Burkhart Patent No. 2,628,346 in its first Office Action, dated November 9, 1953, which shows an anti-coincidence circuit plus a counter.[6] The only difference between this Burkhart "circuit plus counter" and plaintiff's claims rests in the nature of the circuit itself. Plaintiff was thereby alerted to the special importance of the circuit itself. However, although plaintiff filed an amendment to this application in response to this Office Action, he still did not call the relevant circuit in the High-Speed text to the attention of the patent office.

Plaintiff's inclusion of claim 31 in his original patent application is further proof of his intent to deceive the patent office.

Unlike application claims 19–25 and 32–36 (which became '100 patent claims 1–11) which plaintiff would distinguish from the High-Speed text on the basis of the added counter, claim 31 includes no counter; it is directed solely to an or-not-and circuit. Claim 31 claims:

> An electrical comparison device comprising a pair of inputs and an output, means to cancel out time coincident pulses of like polarity in said inputs and to pass unmatched pulses of at least one polarity from at least one of said inputs.[7]

Plaintiff argues that because the patent office rejected claim 31 in May, 1955, as being anticipated by two prior art references—an Ayres patent and a Goldsmith patent—plaintiff had no duty to cite High-Speed since there is no duty to cite cumulative references. It is true that there is no duty to cite cumulative references.[8] *J.P. Stevens, supra,* 747 F.2d at 1559–60. However, claim 31 was not rejected for three years after application. Plaintiff failed to disclose High-Speed during those three years and that fact is relevant to the issue of intent, especially in light of plaintiff's acute awareness in 1952 of the potential problems of patenting such a claim.

Plaintiff also contends that he and his attorneys failed to cite the High-Speed text to the patent office because the technology of or-not-and circuits was so well known

6. Although this circuit (Fig. 2 of Burkhart) may not technically be an "or-not-and" circuit because it has three inputs rather than two, it is equivalent to an or-not-and circuit for purposes of this case since it produces an output signal whenever the input signals are not in agreement. Plaintiff argues that it is improper to characterize Burkhart as an or-not-and circuit with a counter because Burkhart shows a "voting circuit" rather than an or-not-and circuit. A "voting circuit" is one in which signals are received from three inputs and the output is determined by the majority of the inputs. However, this argument fails because Burkhart discloses *both* an or-not-and circuit plus a counter (Fig. 2 of Burkhart) *and* a voting circuit (Fig. 3). It is of course Fig. 2 of the Burkhart patent that is relevant to this case.

7. Plaintiff attempts to distinguish claim 31 from pages 271–72 of the High-Speed text on the ground that the High-Speed circuit responds only to pulses of positive polarity, while claim

31 cancels out pulses of "like polarity," which necessarily means pulses of both positive and negative polarity. But the High-Speed circuit does read on claim 31; a circuit that cancels out coincident pulses that are both positive does have "means to cancel out time coincident pulses of like polarity," as would a circuit that cancels out pulses that are both of negative polarity. Claim 31, by its own terms, does not require the capacity to cancel out coincident pulses of both positive and negative polarities. Moreover, as with '100 patent claims 1–11, any such possible distinction would be for the examiner to decide.

8. It is also true that inequitable conduct directed solely to disallowed claims is insufficient to render a patent unenforceable. *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1457 (Fed.Cir.1984). Inequitable conduct directed *solely* to claim 31 would therefore not render plaintiff's patents unenforceable.

that they assumed the examiners knew of it and it therefore needed no citation. However, plaintiff's contention that he believed the technology contained in the High-Speed text was widely known when he filed his application is severely undermined by a letter he wrote to Stephens in 1962, where he stated:

HIGH SPEED COMPUTING DEVICES was considered to be a very advanced textbook on the electronic computer art in the early 1950's so the information in it is mostly about things which were not obvious to those skilled in the computer technology at that time.

More importantly, plaintiff's duty was to disclose any information where there was a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56; *American Hoist, supra,* 725 F.2d at 1362–63 (the standard embodied in § 1.56 "most closely aligns with how one ought to conduct business with the PTO").[9] Plaintiff's early correspondence makes it clear that he believed that the High-Speed text was important as to whether his or-not-and circuit claims would be allowed.

Having found that threshold materiality and threshold intent are both shown by clear and convincing evidence, and that no genuine issue of fact exists as to either, the final step in the analysis is to "balance" these two factors and determine, as a matter of law, whether plaintiff is guilty of inequitable conduct. *J.P. Stevens, supra,* 747 F.2d at 1560. Here it is clear that inequitable conduct occurred. The high "but for" standard of materiality is demon-

strated by the testimony of Examiner Miller *and* Examiner Robinson. A high level of intent is demonstrated by the correspondence between plaintiff and his attorneys showing that he knew of the materiality of the High-Speed text, yet failed to call it to the attention of the patent office. This evidence demonstrates an intent to deceive. *Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed. Cir.1984) ("where they knew, or should have known, that the withheld reference would be material to the PTO's consideration, their failure to disclose the reference is sufficient proof of the existence of an intent to mislead the PTO."); *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1152 (Fed.Cir. 1983). Under these circumstances the court is compelled to find that inequitable conduct occurred rendering the patents at issue unenforceable. Even if plaintiff's protestations of "good faith" were sufficient to create an issue as to plaintiff's deliberate intent to deceive, the result would necessarily be the same. "Good faith" does not negate inequitable conduct. *Argus Chemical, supra,* 759 F.2d at 14–15. Where a high degree of materiality is shown, as it is here, reckless or grossly negligent activity is sufficient to establish inequitable conduct.

Finally, plaintiff argues that even if he engaged in inequitable conduct, that conduct only relates to claims 1 to 11 and 45 to 48 of the '100 patent and should only render *those* claims unenforceable and not the claims that plaintiff asserts are infringed by defendants' devices. However, as the Federal Circuit stated:

Once a court concludes that inequitable conduct occurred, all the claims—not just the particular claims to which the ineq-

9. Plaintiff also quotes the testimony of Walter Burns, a former patent examiner, to the effect that patent practitioners in the 1950's "infrequently" cited or called attention to prior art. Plaintiff apparently invites the court to conclude that plaintiff was under no duty to call the patent office's attention to prior art. In *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.,* 759 F.2d 10, 13 (Fed.Cir.1985), the court rejected such an argument:

The question of the appropriate standard for determining inequitable conduct in procuring a patent is one of law. Thus, the testimony of an attorney on the practice which some attorneys followed is irrelevant.

*See also Driscoll, supra,* 731 F.2d at 884 (Regulation 1.56 "essentially represents a codification of the 'clear hands' maxim as applied to patent applications" (citing, *inter alia, Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933))).

uitable conduct is directly connected—are unenforceable.

*J.P. Stevens, supra,* 747 F.2d at 1561. Plaintiff urges the court not to follow the rule in *Stevens,* which he mischaracterizes as dictum,[10] arguing that the Supreme Court authorities he cites are controlling and require a different result. However, neither of the Supreme Court cases plaintiff cites, *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), or *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), resulted in holdings contrary to the rule in *Stevens.*[11] The court is therefore bound by and compelled to follow the holding in *Stevens.*

In summary, there is clear and convincing evidence, and no genuine issue of fact, that plaintiff knew of the High-Speed text and its materiality and failed to call it to the attention of the patent office. The undisclosed text was highly material to several of plaintiff's claims. This failure to disclose constitutes inequitable conduct rendering plaintiff's patents unenforceable.

In *Kangaroos U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571 (Fed.Cir.1985), the Federal Circuit reversed the district court's grant of summary judgment on the grounds of inequitable conduct. However, the court did not preclude summary judgment in all such cases. It merely found that "the intent of the actor is a factor to be considered in judicial determination of fraud or inequitable conduct, and that intent was not *on this record* amenable to summary judgment." 778 F.2d at 1577 (emphasis added). The record in the present case is sufficiently clear and well-developed to permit a finding of the requisite intent, based as it is on the undisputed correspondence between plaintiff and his attorney.

## II. Hillyer Patent

■ An additional and alternative ground for granting summary judgment in favor of defendants is plaintiff's (and plaintiff's attorneys') failure to correct incorrect statements made to the patent office with regard to Hillyer Patent No. 2,679,636. Shortly after taking over the prosecution of the parent Hemstreet application, the Link attorney, Richard Stephens, filed an amendment to the application on November 17, 1955, in which he called the examiner's attention to the Hillyer patent. He argued that while this prior art patent, and several others, all show devices constructed for the purpose of character recognition, they all differ from the Hemstreet system by identifying symbols by "acceptance due to similarities" rather than by "rejection due to differences." Stephens explained:

> Each of the five character sensing patents mentioned above [including Hillyer] identify symbols by 'acceptance due to similarities.' Each of the reference devices lists the unknown symbol in one or more ways and *upon finding sufficient similarity* makes an indication that the unknown symbol *corresponds* to a particular known or reference symbol. Applicant's system on the other hand, identifies symbols by 'rejection due to differences.' Applicant tests the unknown symbol and *upon finding sufficient difference* indicates that the unknown symbol does not correspond to a particular known or reference symbol.... That Hillyer basis [sic] identification on 'acceptance due to similarity' is shown in the second sentence, column 1 of that patent.

In fact, the systems disclosed in the Hillyer patent operate on the basis of differences between the signals being compared. The Hillyer patent describes systems that operate by generating two series of waves which represent or embody the unknown

---

**10.** In *Stevens,* the inequitable conduct occurred as to certain process claims in the patent, but it was the product claims that were rendered unenforceable.

**11.** In fact, the Court in *Keystone Driller* held that inequitable conduct directed to one patent was sufficiently related to four other patents to preclude enforcement of all five.

piece of information and the "recorded reference information." The description states:

The first and second series of waves are generated in synchronism.... Each independent data wave is opposed to its associated reference data wave, for the purpose of deriving a third series of waves representing *the instantaneous amplitude differences* between the opposed waves.

The effective amplitude of each wave *representing the instantaneous amplitude differences* between each pair of simultaneously generated reference and independent data waves is indicative of the degree of match between such waves.

Hillyer patent (DDX–155), col. 2, lines 8–9, 12–22 (emphasis added). Plaintiff's experts Mitchell and Slotnick both testified that Hillyer functions on the basis of differences.

Plaintiff contends that an issue exists as to whether Hillyer does in fact operate on the basis of differences or similarities, citing the testimony of Walter Burns. But the testimony plaintiff relies on was struck by Burns, prior to his execution of the transcript, and was corrected with the following response.

Q. Is there any room for difference of opinion which would account for Mr. Stephens saying that Hillyer works on acceptance due to similarities?

A. In my opinion is there any room?

Q. Yes.

A. While there is often room for difference of opinion, in my view there can be no difference of opinion as to the operation of the Hillyer systems which would permit one to assert that the Hillyer patent teaches acceptance due to similarities and not rejection due to differences.[12]

Plaintiff also cites the testimony of M. David Freedman, one of defendants' experts, who testified as follows, in discussing the process by which the waves are compared.

Q. Where are they compared?

A. In the amplitude difference generator—In block number 18 they are compared. The difference is taken in block 18 between the 22 [sic] waves, and then a determination is made as to how similar they are.

Q. Where is that?

A. I am sorry, you are correct. A signal is generated which indicates the similarity or difference between the element being asked and answered in the reference data and portions, different portions of information in the independent data source. This is displayed or indicated by the indicator in 22.

Q. What does block 19 do?

A. Generates a signal or creates a signal, however you want to put it, which indicates the similarity of a portion of the reference data to—I am sorry, of the reference data, the unknown to a portion of the independent data source, in this case which is a set of knowns.

Although Freedman uses both words—"difference" and "similarity"—in his discussion, this represents an imprecise use of language rather than the statement of a contrary position. Freedman testifies that the signal generated by the "amplitude difference generator" indicates "the *similarity or difference*" between the unknown and reference data. He thus demonstrates a rather careless attitude toward the use of these two words, which is, however, somewhat understandable. "Difference" and "similarity" are obviously related just as, for example, are "hot" and "cold." "Twenty degrees Fahrenheit" might be the answer to the question—"How hot is it?"—or to the question—"How cold is it?" Any

12. Even Burns' original response is too vague and conclusory to create an issue of fact. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir. 1984).

indication of difference between two items cannot help but also be an indication of their similarity as well. Thus a high degree or measure of difference also indicates a low degree of similarity, and so on. The Hemstreet device counts differences between the pulse train generated from the unknown character and the reference pulse trains. However, each count, while measuring differences, could be said to represent the "similarity" between characters insofar as a high "difference count" also represents a low degree of similarity, and so on. While Freedman's indiscriminate use of the words "difference" and "similarity" may be understandable, however, it also renders his testimony of little significance on this issue and does not create an issue of fact as to how the Hillyer device actually functions. He at no time disputes that the Hillyer device compares the two initial waves and creates a third wave on the basis of the difference between their amplitudes. There is thus no genuine issue as to how the Hillyer device functions.

Defendants do not contend that Stephens necessarily knew that his statement to the patent office in 1955, distinguishing Hillyer as based on acceptance due to similarities, was false. The description of the Hillyer device uses somewhat confusing language on this point, referring to "degrees of similarity" and "degree of match" at the same time that it describes the process for determining the amplitude differences between the two waves, making an initial mistake by Stephens plausible. Moreover, Stephens wrote the following note at the top of a copy of the Hillyer patent:

"Works on amplitude only and responds to similarities."

In an office action of June, 1957, the examiner rejected only one claim—application claim 3—on the basis of Hillyer. Stephens filed an amendment in response to this office action but did not correct his prior representation as to the nature of the Hillyer systems. On December 29, 1958, the examiner issued a final rejection of all of the claims of the Hemstreet application, and Stephens asked Irving Kayton to prepare a response.

Stephens turned the prosecution over to Kayton and Kayton reviewed the file very thoroughly. He reviewed the prior art that had been cited very carefully, including the Hillyer patent. Kayton realized that the Hillyer device functioned on the basis of differences between the two signals. Next to the notations that Stephens had made at the top of the Hillyer patent Kayton made further notations. Next to the notation, "Works on amplitude only," Kayton wrote, "Yes! I.K.", but next to where it said "and responds to similarities," Kayton wrote, "No! I.K." Neither Kayton nor Stephens, however, ever corrected the original misrepresentations made to the patent office. Instead, Kayton filed a response to the patent office's rejection of the Hemstreet claims in which he argued that "the very pith and essence of applicant's invention resides in the fact that an anti-coincidence detector is utilized." [13] Plaintiff's attorneys later copied claims from a Blauberman patent 2,947,971 and a Chiang patent 3,187,305 which were directed to the concept of considering differences, without calling attention to Hillyer or correcting the record.

13. To place the quote in context, the entire paragraph stated:

It is at the outset essential to recognize that the very pith and essence of applicant's invention resides in the fact that an anti-coincidence detector is utilized, and that it drives a counter which totals or sums the number of anti-coincident detections established by a character scanning or sensing means wherein a character to be recognized or identified may be compared with an entire dictionary of stored reference characters each of which is represented by a binary code. The history of this case demonstrates that there is no prior art known which utilizes an anti-coincidence detector and a counter which totalizes all of the anti-coincidence detections for the purpose of ascertaining whether a reference item of indicia is, or is not, the same as the item of indicia under examination.

Once again, the proof of threshold materiality is clear, convincing, and direct. Examiner Robinson testified that at the time he allowed the Hemstreet applications he was not aware that the Hillyer system worked on the basis of differences and had never been informed of that fact. He also testified that he was guided by the representations of plaintiff's attorneys and relied on those representations as to how the Hillyer systems function. He also testified that after reviewing the Hillyer patent in connection with this case he determined that the Hillyer systems work on the basis of rejection due to differences, that information as to the correct nature of the operation of the Hillyer systems was material to his handling of the Hemstreet applications and important to his decision to allow those applications. Finally, he testified that the Hillyer patent anticipated '100 patent claims 22, 39 and 50–52 and '099 patent claim 65 and that he would not have allowed these claims if he had been aware of the correct operation of the Hillyer systems. It is therefore clear that the misrepresentations made to the patent office regarding the operation of the Hillyer systems and the failure to correct those representations satisfy the subjective "but for" standard of materiality and the lower standards as well.

As to the issue of intent, it is clear that plaintiff's attorney made incorrect statements to the patent office regarding the Hillyer patent, that Kayton subsequently learned that these statements were incorrect, and that Kayton (and Stephens) continued to represent to the patent office that rejection due to difference was the "pith and essence" of the Hemstreet devices,

without ever correcting the incorrect representations that had been made. This constitutes clear and convincing evidence of (at least) Kayton's intent to deceive.

Plaintiff makes essentially two arguments that an issue exists as to intent. First, he argues that Kayton did not really believe that Hillyer worked on the basis of differences, in spite of his notation at the top of the Hillyer patent. However, Kayton's deposition testimony confirms his understanding of that point. Kayton responded as follows:

Q. Now, take it at the time you wrote, "No! I.K." at the top of Defendants' Exhibit 170. You knew at that time that the Hillyer patent operated on the basis of determining dissimilarities rather than similarities. Is that correct?

A. Well, I knew at that time that it operated as far as those sentences that you showed me are concerned on amplitude differences. When I put that down, that is what that indicated. And, yes, it works on amplitude. And the sentences indicated that it works on amplitude dissimilarities.

Plaintiff argues that a second response to essentially the same question at a different place in the deposition casts doubt on this point and created an issue of fact. However, Kayton never denied that he realized the "responds to similarities" statement was incorrect and never denied that he understood Hillyer at that point to work on the basis of amplitude differences. In fact, as a part of this response Kayton again acknowledges that Hillyer dealt with "differences in amplitudes." A careful reading of the response [14] reveals for the most part

14. The entire exchange went as follows:
Q. I take it at the time you wrote "No! I.K." on the front of Exhibit 170 that you realized that the handwritten statement that "responds to similarities" was incorrect. Is that correct?
A. Well, that is too broad a statement for me to confirm at this point. The word "similarities" is a very broad term and maybe there was some aspect of it that I didn't disagree with, but there was something there within the generic concept of similarities that I didn't

agree with. For example, some of the language that you read to me, I guess it was in col. 3—were you reading to me from that?—the difference between the amplitudes in col. 3, lines 37 to 40. That trigguers [sic] off a thought. There he is talking about differences in amplitudes, and those were not the kinds of differences that I vaguely recollect that were of significance in the invention at the time. Because the invention at the time was a digital system where differences had to

only vague qualifications and rhetoric that attempts to distinguish between a "wild generic 'No'" and a "very qualified 'No.'" The only specific reservation Kayton attempts to discuss is based on the fact that Hillyer used amplitude of signals while Hemstreet used digital counts. But that point was expressed by his "Yes. I.K." in affirming the previous notation of Stephens dealing with amplitudes and addresses a separate issue. No issue of fact is created by this response.

The second argument plaintiff makes is that there is no proof that Kayton ever told Stephens his discovery about Hillyer. While this seems unlikely, since Stephens supervised Kayton's work, it is true that there is no proof of such communication. Both Kayton and Stephens testified that they "do not recall" whether they discussed this subject. It is, however, immaterial whether Kayton told Stephens or not. Kayton knew of the mistake and it was *his* obligation, as well as Stephens' or any other attorney's, to correct any misrepresentation that had been made. The duty of candor and good faith to the patent office "rests on the inventor, *on each attorney or agent who prepared or prosecutes the application* and on every other individual who is substantively involved in the preparation or prosecution of the application." 37 C.F.R. § 1.56(a) (emphasis added). It is undisputed that Kayton was, in the words of Stephens, "prosecuting this case pretty much on his own at that time." There is clear and convincing evidence that Kayton learned of the error that had been made as to Hillyer and, rather than correcting that error and informing the patent office pursuant to his duty of candor, he perpetuated the error by arguing to the patent office that "the pith and essence" of plaintiff's invention was the use of an anti-coincidence detector, *i.e.*, the detection of differences,

without calling attention to Hillyer. This constituted inequitable conduct rendering plaintiff's patents unenforceable.

### III. Other Alleged Inequitable Conduct

Defendants also argue that plaintiff engaged in inequitable conduct as to a King patent, a Shepard patent, and an allegedly "sham" interference practice. However, there are issues of fact that would preclude granting summary judgment on any of these three additional grounds, but which, of course, do not affect the decision to grant summary judgment on the basis of the High-Speed text and/or the Hillyer patent.

 As to the King patent, defendants contend that an interference proceeding, involving plaintiff's '100 patent application, the King patent 3,469,263, and a Shepard patent 2,897,481, was dissolved, resulting in an interference estoppel as to the King patent, which was presumptively senior to plaintiff's patent as the result of a prior application filing date. This alleged estoppel, they argue, conclusively precludes plaintiff from claiming anything disclosed in the King patent. Defendants contend that plaintiff and his attorneys were aware of this estoppel and were also aware that plaintiff's application claim 93 read on the system of the King application. Nevertheless, they say, plaintiff pursued his application for this claim and several others dependent on 93, all of which became '100 patent claims 13 to 21, and falsely stated to the patent office that all the claims in the case "distinguished clearly" from King.

Summary judgment must fail as to the King patent because a genuine issue of fact exists as to who, if anyone, knew that claim 93 read on the King system. Defendants rely heavily, as support for this point, on a document, DDX–378, consisting of a two page, handwritten list of what appears

do with count numbers, I believe, and this had to do with differences in amplitude of signals. So, although I may have said 'No' to the generic concept of similarities, it may have been just a small part of it. So I would not like for that "no" to mean a wild generic no.

However, of course, this is all very hazy to me. It is just that the word "amplitude," the differences between the amplitudes, is in essence a non-digital concept. The whole technology was a digital context [sic]. So the word "no" may very well be a very qualified no.

to be the numbers of the claims of a patent, presumably those of the Hemstreet application. Next to these numbers are short notations, such as "cancelled," "No, Exclusive OR," etc. Next to the number 93 is the notation "(Rabinow claim 12) Yes." Defendants contend that this list was prepared by the Hemstreet attorneys and indicates whether the Hemstreet claims read on the King patent. Thus, they argue, the word "yes" next to number 93 proves that the Hemstreet attorneys knew that this claim, later rewritten and ultimately allowed, read on King, but represented to the patent office that all of the Hemstreet claims distinguish from King.

The problem with this argument is that the list defendants rely on—DDX–378—is not captioned or described and so defendants' interpretation relies on conjecture and inference. Unlike plaintiff's correspondence related to the High-Speed text or Kayton's notation on the Hillyer patent, no individual has explained and admitted to the significance of the notation "yes" following the number 93.[15] Defendants attempt to corroborate and thus prove the significance of the notation "yes" on DDX–378 by comparisons to other documents. While some of these comparisons and the inferences drawn may be reasonable, it cannot be said on this record that defendants have proved by clear and convincing evidence, and without any issue of fact, that plaintiff and his attorneys knew that claim 93 read on the King patent. Therefore summary judgment would not be possible as to the King patent.

 Defendants also contend that plaintiff engaged in inequitable conduct when he and his attorney represented to the patent office that a Shepard patent No. 2,663,758 does not employ "tolerance" when in fact they knew and believed that it does. However, summary judgment would not be possible on the basis of representations

relating to the Shepard '758 patent because a genuine issue exists as to the meaning of "tolerance" and therefore as to the intent of plaintiff's attorney in representing to the patent office that it was not employed by the Shepard patent.

Shepard '758 describes a device that can recognize certain preselected variations of an ideal character by providing additional alternative logic paths through its logic tree. In other words, a logic tree with two such alternate paths might recognize an ideal character and one preselected variation (as though they were two different characters); a logic tree with three paths dedicated to the same character could recognize the ideal and two variations, etc. But each unknown character would have to conform exactly to one of these preselected logic paths in order to be recognized.

Stephens understood this about Shepard, as demonstrated by a memo he wrote dated May 3, 1972. Defendants contend that this understanding is contrary to representations Stephens made to the patent office shortly thereafter that Shepard does not use any "tolerance" whatever. Defendants' argument requires the court to conclude that the term "tolerance" must describe any method for accommodating variations, including the method described by Shepard, and, furthermore, that Stephens used and understood the word that way. Such a conclusion is not possible on the basis of the record.

In the May 16, 1972, amendment by Stephens, submitted to the patent office and relied on by defendants, the following statement is made:

> Flory et al. and Shepard are similar, neither employing a tolerance. None of the prior art appears to combine individual signals derived from sensing different individual elemental character portions which are distributed in two dimensions

---

**15.** Plaintiff apparently concedes that a Fred Smythe authored the list. Smythe died approximately twenty years ago and so no deposition of him was possible. Although Stephens acknowledged in his deposition that Smythe authored DDX–378, he denied knowing why Smythe prepared it.

in the area which encompasses the character, thereby to provide a further signal which does not depend upon character location, *and then compare that further signal with stored data, to determine which stored data it corresponds with and which it differs from within finite tolerances.*

(DDX–193, p. 478) (emphasis supplied). In light of the operation of the Hemstreet device, this passage seems to suggest that it has the capacity to accommodate imperfections by incorporating certain "finite tolerances" (as used in the quoted passage) within the comparison process. Thus whereas a small imperfection in an unknown character might create an unmatched pulse, thereby triggering an output signal in plaintiff's or-not-and circuit and moving the counter forward, this might be avoided through the use of "tolerances" which would enable the pulses to be treated as coincident in time rather than anticoincident, thereby triggering no output signal.

The following paragraph of the May 16, 1972, amendment by Stephens also supports the conclusion that Stephens used the word "tolerance" in a relatively restrictive sense which excluded the type of variation accommodation in Shepard. It states:

> [A]pplicant's [Hemstreet's] use of a *tolerance* in *comparing* scanning-derived data with each item of stored data representing a known character is deemed important and novel. As shown above, the combinatorial logic of ... Shepard does not use any tolerance whatever. Nor do the recognition logic circuits of any of those prior art systems do any *comparing....* Each path through the Shepard relay tree similarly is describable by a boolean equation, and each input is necessary to complete the path. The only way such systems can allow for any appreciable variation in a character being scanned from an ideal character is to provide *additional AND gates* or *addi-*

*tional relay tree paths* for *expected* variations from the ideal character.

(DDX–193, p. 479) (emphasis in original). Stephens thus appears to explain what he understood to be the difference between Hemstreet and Shepard for the benefit of the patent office. It therefore cannot be concluded that Stephens intended to deceive the patent office by his statements regarding Shepard and the use of tolerance, and defendants' motion for summary judgment would fail on this ground.

■ Finally, defendants argue that plaintiff engaged in inequitable conduct when he intentionally delayed the issuance of the patent through a "sham interference practice." The gist of defendants' argument is that plaintiff deliberately "stretched" and "contorted" the language of his claims in unjustifiable ways in order to lay claim to new developments in the field and to position himself more strategically for commercial success. Plaintiff contends that all interference proceedings were undertaken in good faith in order to protect his legitimate property rights. An issue of fact exists as to plaintiff's state of mind and purpose in engaging in these proceedings and no summary judgment could be granted on this ground. Summary judgment is therefore granted in favor of defendants on the basis of (1) plaintiff's failure to disclose the High-Speed text and/or (2) the failure to correct the misrepresentations made as to the Hillyer patent, but not on the basis of defendants' other arguments.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment on the issue of inequitable conduct is granted. Plaintiff's patents are found to be unenforceable and plaintiff's complaint is dismissed with prejudice.

APPENDIX

FIG. I.

FIG. 2

FIG. 2a.

FIG. 4.

MAGNETIC DRUM MEMORY

ELECTRONIC SCANNING DEVICE

VIDEO AMPLIFIER

VIDEO AMPLIFIER

VIDEO AMPLIFIER

OR-NOT-AND CIRCUIT

OR-NOT-AND CIRCUIT

ELECTRONIC PULSE COUNTER

RELAY OR ELECTRONIC SWITCH

REJECT DEVICE

VIDEO AMPLIFIER

INVENTOR
HAROLD S. HEMSTREET
BY
Robert Irving Williams
ATTORNEY

## FIG. 2b.

VOLTS

31
30
31 30

→ TIME

OUTPUT FROM
ELECTRONIC
SCANNING
DEVICE

## FIG. 3.

MAGNETIZATION INTENSITY

33
34

MAGNETIC
RECORD
ON DRUM

VOLTS

35m
0
36m 37m

→ TIME

OUTPUT FROM
MAGNETIC DRUM
PICK-UP HEAD

## FIG. 5.

VOLTS

35c
0
36c 37c

→ TIME

VOLTAGE FROM
ELECTRONIC
SCANNING DEVICE
AFTER
DIFFERENTIATION

## FIG. 7

INVENTOR
HAROLD S HEMSTREET
BY
Robert Irving William
ATTORNEY

FIG. 6.

INVENTOR
HAROLD S. HEMSTREET
BY
Robert Irving Williams
ATTORNEY

FIG. 8.

INVENTOR
HAROLD S. HEMSTREET
BY
ATTORNEY

3.713.100

FIG. 10.

FIG. 10a.

FIG. 9.

INVENTOR

*HAROLD S. HEMSTREET*

BY

*Robert Irving Williams*

ATTORNEY

FIG. II.

INVENTOR
HAROLD S HEMSTREET
BY
Robert Irving Williams
ATTORNEY

# FIG. 12.

# FIG. 13.

INVENTOR
HAROLD S. HEMSTREET
BY
Robert Irving Williams
ATTORNEY

# FIG. 14.

INVENTOR
*HAROLD S. HEMSTREET*
BY
*Robert Irving Williams*
ATTORNEY

# FIG. 14b.

# FIG. 14a.

# FIG. 15.

ROTATION OF
DEFLECTION YOKE
ON SCANNING TUBE

SCAN LETTER
(ONE FIELD)
COUNT PULSES

RESET COUNTERS
SWITCH COUNTER OUTPUT
TO RELAY UNITS

SCAN LETTER
(ONE FIELD)
COUNT PULSES

INVENTOR
HAROLD S. HEMSTREET
BY
Robert Irving Williams
ATTORNEY

## ON MOTION FOR RECONSIDERATION

On January 30, 1987, this court granted defendants' motion for summary judgment on the issue of inequitable conduct. Specifically, plaintiff was found to have engaged in inequitable conduct when he (1) failed to call to the attention of the patent office pages 271–72 of the text, High-Speed Computing Devices, and (2) failed to correct erroneous statements made to the patent office regarding Hillyer patent No. 2,679,-636. Consequently, plaintiff's patents were found to be unenforceable and plaintiff's complaint was dismissed with prejudice. Plaintiff now asks the court to deny defendants' motion on reconsideration.

■ Plaintiff argues that granting summary judgment was improper because the court relied on the court-appointed expert, Dr. Andre Vacroux, to resolve several genuine issues of material fact in order to reach its result. However, Dr. Vacroux was not asked to, nor did he, address the merits of any legal or factual issue. In a letter of August 2, 1985, from the court to Dr. Vacroux, Dr. Vacroux was asked to review the materials submitted by the parties in connection with various issues raised by those motions to increase the court's understanding of the technical matters presented. (Letter to Dr. Vacroux, attached to Minute Order of February 4, 1987.) However, Dr. Vacroux was not asked to comment on or to render his opinion on the merits of those issues. He was told not to concern himself with legal arguments. His expertise was sought with respect to "technical" matters. The court instructed Dr. Vacroux:

Please keep in mind that with regard to each of these issues [dealing with infringement], you should attempt to interpret the testimony and opinions of Mssrs. Mitchell, Hemstreet, Frost and Glass rather than reach your own conclusions independently; at least for this stage of the case. Although I may ask you during and after trial to draw your own independent conclusions, Burroughs bears the burden on its motion to show

that Hemstreet's witnesses share its views as to the material facts.

\* \* \* \* \* \*

Again, please approach these issues [dealing with conduct before the patent office] from the perspective of the parties' witnesses, including Messrs. Smith, Robinson, Mitchell, Slotnick, Glass as their testimony is included in the materials filed by Burroughs and Hemstreet. (Letter to Dr. Vacroux at 2.) A review of Dr. Vacroux's reports, which are also attached to the Minute Order of February 4, 1987, shows that Dr. Vacroux did in fact comply with the court's instructions and confine his analysis to a review of the materials submitted by the parties. He offered no independent findings, conclusions or recommendation. Although plaintiff repeatedly asserts that the court relied on Dr. Vacroux to resolve factual issues, it is significant that plaintiff never cites to Dr. Vacroux's reports for particular examples of where Dr. Vacroux did so. Finally, the court did not, contrary to plaintiff's assertions, rely on any alleged opinions of Dr. Vacroux's as to the merits. As reflected in the Memorandum Opinion and Order of January 30, 1987, the decision to grant summary judgment was based on the evidence submitted by the parties. That evidence in turn demonstrates that no genuine issue of material fact exists and summary judgment was and is appropriate.

■ Plaintiff also argues that the court failed to comply with Federal Rule of Evidence 706(a), which provides:

*Appointment.* The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall

have opportunity to participate. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

Plaintiff contends that the court violated Rule 706(a) by (1) not filing the written deposition of Dr. Vacroux's duties in a timely fashion; (2) not holding a conference to allow plaintiff to participate in framing his duties, (3) not allowing plaintiff to take his deposition, and (4) not allowing plaintiff to cross-examine him. But there was no need for Dr. Vacroux's deposition and cross-examination since Dr. Vacroux was not called upon to render any "findings" of his own, within the meaning of Rule 706(a). An expert's "findings" are his or her own expert opinions as to the merits of the case, which Dr. Vacroux was not asked for and which he did not give. Had he done so for purposes of a trial, his deposition would be appropriate.

It is important to note the procedural point at which the expert's assistance was obtained by the court. A busy trial court faced with complex technology may require independent education or analysis if it is to understand the technology before the trial. The parties nominated Dr. Vacroux and agreed that he is an independent expert. If a motion for summary judgment appears to have merit a court will need some education about the technology at an earlier stage of the proceedings but it will not need independent findings. That is this case. What was sought here was an independent explanation of the technology and assistance in understanding the positions of the parties' experts.

Arguably, however, the parties should have been permitted to comment on the experts' reports before the court ruled on the summary judgment motion. However, these reports have now been filed, and the court has considered the comments of the parties.

■ Plaintiff also contends that he was deprived of his constitutional right to trial by jury. However, "where no issue of fact remains, summary judgment decides only questions of law and does not deprive the losing party of its jury trial right." *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1261 (11th Cir.1983) (rejecting argument that seventh amendment was violated); *accord, e.g., Sullivan v. United States*, 788 F.2d 813, 816 (1st Cir.1986); *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir.1957). Therefore plaintiff's seventh amendment right to a jury trial was violated only if summary judgment was not appropriate in the first place. Therefore the only relevant question remains whether summary judgment was appropriate and plaintiff's invocation of the seventh amendment adds nothing to the analysis.

■ Plaintiff now argues that Examiner Robinson is biased and that his testimony cannot be relied on.[1] Plaintiff contends that Robinson is biased because he met

---

1. Plaintiff suggests that he had contested Robinson's credibility when the motion for summary judgment was originally briefed because he had objected during Robinson's deposition to certain questions put to Robinson. (Robinson Dep. at 3–9, 51–52.) However, objections made during the deposition which are not called to the court's attention or discussed in plaintiff's memoranda hardly constitute a proper way of raising an issue. But that is largely irrelevant, since the objections made during the deposition are without merit. Plaintiff objected that the scope of Robinson's deposition was limited to factual matters and did not extend to the "bases, reasons, mental processes, analyses or conclusions of this examiner in acting upon the patent appli- cation." (Robinson Dep. at 4–5.) This objection was raised by telephone at the beginning of the deposition with Magistrate Dwyer. (Robinson Dep. at 3–9.) The magistrate correctly ruled that such limitation limited only the scope of questions that a former examiner can be *compelled* to answer. (Robinson Dep. at 38–40.) *See, e.g., Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 136 (N.D.Ill.1973) ("[patent examiners] are subject to *compulsory* testimony only on matters that are factual") (emphasis added). It would make no sense for the law to recognize and approve of the "subjective 'but for'" standard of materiality, as the Federal Circuit has consistently done, if the patent examiner involved could not testify that he would

with defendants' lawyers before his depositions and they paid him a fee of $40 per hour for the time he spent reviewing the Hemstreet application file before giving his deposition. However, such meetings and small sums of money are not sufficient to raise an issue of fact as to Robinson's credibility. Robinson is not an employee of defendants and does not stand to benefit if defendants prevail.

As to the High-Speed text, plaintiff challenges the court's statement at pages 1104–1105 of the January 30 Opinion that plaintiff "failed to call the High-Speed text to the attention of the patent office." Plaintiff argues that the court is mistaken because it did call that text to the attention of the patent office in the '100 patent, col. 13, lines 57–60. However, that reference was to page 17 of the High-Speed text and was made to provide an example of a binary counter:

> Counters of this type are well known being described, for example, in the standard text, HIGH SPEED COMPUTING DEVICES by Engineering Research Associates, published by McGraw-Hill. Reference may be had particularly to section 3–5, page 17 thereof.

No mention was ever made, however, of pages 271–72 of the High-Speed text. The High-Speed text was never mentioned in the context of "or-not-and" circuits nor was the circuit shown on pages 271–72 ever referred to or identified. The reference to page 17 of the High-Speed text was (1) physically quite separate from the relevant pages of the text, (2) related to different subject matter, and (3) not cited as a prior art reference. The suggestion by plaintiff that by this mention the patent office "had actual notice of that text and its entire contents, including pages 271–72" (Plaintiff's Memorandum in Support at 2) for purposes of fulfilling plaintiff's duty of disclosure is frivolous.[2]

Most of plaintiff's other arguments present nothing new and were addressed in the January 30 Opinion. One general observation addresses them. Certain testimony by plaintiff and other witnesses was rejected in the January 30 opinion as vague and conclusory and found not to create a genuine issue of fact. Plaintiff contends that in doing so, the court actually "resolved" issues of fact. Plaintiff's argument seems to suggest that any statement, however vague or conclusory, is sufficient to create an issue of fact. But that is not so.

> With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged.... the party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement *of fact or facts set forth in detail* in an affidavit by a knowledgeable affiant. *Mere denials or conclusory statements are insufficient.*

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835–36 (Fed.Cir.1984) (emphasis added).

■ Finally, plaintiff argues that the inequitable conduct in connection with the High-Speed text related only to claims in the '100 patent and therefore would not render the '099 patent unenforceable. Although the rule in *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559–60 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), requires only that all claims in a single patent be rendered unenforceable, it does not prohibit claims in other patents from also being rendered unenforceable as well, under certain circumstances. Quite the opposite, in *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), the Supreme Court held that inequitable conduct addressed to one patent was sufficiently related to four others

---

not have approved a patent but for certain misrepresentations or omissions. *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1363 n. 4 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

**2.** The suggestion that the January 30 Opinion is in error, even as a purely factual matter, is also frivolous. On page 11 that Opinion states:

> Neither plaintiff nor his attorney, Williams, ever called *pages 271–72* of the High-Speed text to the attention of anyone at the PTO, ... Subsequent statements regarding the High-Speed text were clearly made in the context of discussing plaintiff's or-not-and circuit and pages 271–72 of the High-Speed text as an example of prior art.

to render all five unenforceable because the Court found "the devices covered by the five patents to be important, if not essential, parts of the same machine." *Id.* at 246–47, 54 S.Ct. at 148. Although the '100 and '099 patents are two separate patents, they result from the same original 1953 application. The '099 patent issued from a divisional application divided out of the 1953 application. Both deal with methods for identifying characters. Both utilize the "or-not-and" circuit from Figure 6. ('100 patent, col. 3, lines 4–5; '099 patent, col. 2, lines 44–45.) The two patents are therefore sufficiently related to one another and to the failure to disclose the High-Speed text to require that both patents be rendered unenforceable on the basis of that inequitable conduct.

IT IS THEREFORE ORDERED that:

(1) On reconsideration the court adheres to its original decision granting summary judgment in favor of defendants and against plaintiff.

(2) Both sides having responded to this court's order of February 4, 1987, and neither side objecting to the equal division of payment of Dr. Andre G. Vacroux's fees and expenses, plaintiff and defendants are each ordered to pay one half of the total amount of $24,268, without prejudice to the right of any party to seek modification of any amount as taxable costs.