**James Earl RENAUD, et al.,
Plaintiffs–Appellants,**

v.

**MARTIN MARIETTA CORPORATION,
INC., et al., Defendants–Appellees.**

No. 91–1007.

United States Court of Appeals,
Tenth Circuit.

Aug. 4, 1992.

Michael Hausfeld of Cohen, Milstein, Hausfeld & Toll, Washington, D.C. (Richard Lewis and Anthony Z. Roisman of Co-

hen, Milstein, Hausfeld & Toll, Washington, D.C., Kathleen Mullen, John R. Holland, Denver, Colo., William Finger of Frank & Finger, Evergreen, Colo., with him on the brief), for plaintiffs-appellants.

Daniel S. Hoffman (Daniel J. Dunn, R. Craig Ewing, and John D. McCarthy, with him on the brief), of Holme Roberts & Owen, Denver, Colo., for defendant-appellee Martin Marietta Corp.

Arthur R. Karstaedt III of Hall & Evans (Robert W. Harris, Chris A. Mattison and Christopher Cipoletti of Hall & Evans; Michael L. Walker, Henry C. Teigen, Casey S. Funk of the Denver Water Dept., Denver, Colo., with him on the brief), for defendant-appellee City and County of Denver.

Before: SEYMOUR and ANDERSON, Circuit Judges, and OWEN, District Judge.*

OWEN, District Judge.

In this major toxic tort action against the Martin Marietta Corporation ("Martin") and the City and County of Denver, Colorado, acting through its board of water commissioners, the Denver Water Board ("DWB"), plaintiffs allege that as residents of the Friendly Hills suburb of Denver, they suffered catastrophic injuries as a result of their drinking and other use of water contaminated at Martin's Waterton plant and thereafter supplied to residents by DWB's Kassler Water Treatment Plant.

Plaintiffs severally allege that as children and adults in Friendly Hills over the period between 1979 and 1986, they developed cancer or leukemia or seizure disorders or birth defects of the heart. Two children died of cancer. They attribute these tragic occurrences to hydrazines in their water due to Martin's gross failure to properly dispose of hazardous wastes (concededly including hydrazines) resulting from Martin's manufacture of the Titan missile and other aerospace equipment. DWB is charged with inadequately sampling and treating the contaminated water at its Kassler plant.

In an unusually structured procedural setting, the District Court granted summary judgment to both defendants, dismissing the action with prejudice concluding that the proffer by plaintiffs of certain expert testimony fell short of admissibility, and, this proffer being the sole proof on the essential element of plaintiffs' exposure to contaminated water, the action failed. The District Court's opinion, familiarity with which is presumed, is reported at *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545 (D.Colo.1990).

Certain facts are undisputed. Martin's facility, in Waterton, Colorado, is two miles uphill and upstream from Kassler. Two of Kassler's sources of water were Brush Creek, flowing through Martin's facility and used by Martin in its hazardous waste treatment process, and alluvial ground water, much of which originated in or passed through Martin's property. This water at Kassler percolated through infiltration galleries into a five-sided well where it was treated and mixed with substantial amounts of filtered water.

Kassler's water was thereafter chlorinated and distributed to a number of metropolitan Denver neighborhoods. Some received all of their water from Kassler, while others received a mix of waters from Kassler and other DWB sources. These latter neighborhoods included Friendly Hills, plaintiffs' community, over ten miles from Kassler, which never received more than ten percent of its water from Kassler, and that only for the periods June 1977 through December 1980, and from June 1982 through mid-February 1983. Most of Friendly Hills' water came from the Marston Water Treatment Plant, located less than two miles away from Friendly Hills.

In January, 1985, the Colorado Department of Health discovered trichloroethene,[1] a solvent, in water being treated at Kassler. Kassler was immediately closed and has not reopened. In 1985, the state of

---

* Honorable Richard Owen, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. Trichloroethene is a hazardous waste also produced at Martin's facility.

Colorado charged Martin with past and continuing violations of the Colorado Hazardous Waste Act causing significant contamination of ground water, and the Federal Environmental Protection Agency issued a cease and desist order to Martin for unpermitted discharge of hydrazine waste water into Brush Creek. In 1986, Martin entered into a compliance agreement with the state of Colorado and paid $1 million in civil penalties.

Plaintiffs commenced this action in January of 1987. Given its broad nature, the Court, consulting with counsel, eventually determined that the most expeditious procedure to advance the case would be to hold a series of summary judgment proceedings at which evidence would be taken. Plaintiffs were to present their prima facie case on causation as if they were presenting the case to the jury at trial, with the Court to determine whether, on the record thus presented, a reasonable juror could have a basis for concluding that plaintiffs had been exposed to contaminants from Martin's plant—that is, that the water coming out of plaintiffs' taps contained contaminants in sufficient quantities to probably cause the injuries plaintiffs alleged. If the Court determined that plaintiffs *had* met their prima facie burden, then the Court would schedule a test trial in which all of the claims of one or two representative plaintiffs would be tried to a jury.

In accordance with this procedure, a five-day evidentiary hearing was held in July 1990. The evidence plaintiffs presented was categorized by the Court below as follows:

1. factual evidence of contamination at Waterton; 2. expert testimony regarding the levels of contamination at Waterton and the proportion of these contaminants that were transported to Kassler (chemical fate and transport testimony); 3. Kassler water that was actually received by Friendly Hills residents and the levels of contaminants that were in this water (water distribution testimony); and 4. expert testimony regarding the probable cause of plaintiffs' primary injuries (medical causation testimony).
*Renaud,* 749 F.Supp. at 1548.

 To this evidence, the Court below applied certain basic legal principles: 1) Any dispute as to a fact material to the outcome would require denial of summary judgment. *See Florom v. Elliott Mfg.,* 867 F.2d 570, 574 (10th Cir.1989); 2) there must be a basis, on any view of the evidence, upon which a reasonable juror could conclude that contaminants from Martin reached the plaintiffs' taps in quantities sufficient to cause the alleged injuries. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); 3) there must be a basis upon which a reasonable juror could find proximate cause. Under Colorado law, an event is regarded as the proximate cause of an injury "if in the natural and probable sequence of things, it produced the claimed injury. It is an event without which the injury would not have occurred." *See In re Swine Flu Immunization Products Liability,* 495 F.Supp. 1188, 1206 (D.Colo.1980). Or, defined as "causation" in a toxic tort case, there must be a basis in plaintiffs' evidence that would support a reasonable juror's conclusion that defendants had caused plaintiffs' exposure to toxic contamination and that such exposure had caused, or contributed to, plaintiffs' injuries. *See Brafford v. Susquehanna Corp.,* 586 F.Supp. 14, 17–18 (D.Colo.1984). In sum, in this summary judgment setting, the Court below saw itself as being required to deny the motion should there be a prima facie evidentiary showing by the plaintiffs that would support a jury finding that it was reasonably probable that the plaintiffs' injuries resulted from, or were caused by, Martin's contamination in combination with Kassler's neglect. *See Swine Flu,* 495 F.Supp. at 1206.

 The District Court, applying the foregoing to the plaintiffs' evidence, concluded:

Certain issues were clearly established at the hearing. Despite defendants' asser-

tions to the contrary, the evidence was overwhelming that there was massive contamination at Waterton. The evidence of observed discharges and the discovery of trichloroethene in the Kassler water supply constituted ample evidence that Martin's hazardous waste standard operating procedures were not followed, its hazardous waste treatment system was mechanically flawed, or some combination of both. The existence of plaintiffs' injuries, other than the alleged seizure disorders, was uncontested. However, proof that Martin committed reprehensible acts coupled with evidence of injury is not enough to prevail on a tort claim. Plaintiffs must prove that the reprehensible acts caused, or increased the likelihood of, the alleged injuries.

*Renaud,* 749 F.Supp. at 1551.

Plaintiffs' evidence on causation, which the Court below had before it to answer the question left open above, consisted of expert postulation that waste water containing a constant concentration of hydrazines and other contaminants had been discharged by Martin into Brush Creek on a regular basis over an 11–year period and that these contaminants in somewhat smaller percentages arrived at Kassler and were thereafter delivered in measurable quantities to Friendly Hills residents.[2] This 11–year postulation by plaintiffs was extrapolated back by their experts from a single water sample, taken from Martin's waste water Pond T8–A in 1985, two years after plaintiffs in Friendly Hills had gotten their last water from Kassler.[3]

As to this, which constituted plaintiffs' entire presentation of direct evidence of causation, the Court below concluded that an 11–year fate and transport model, supported by only a single data point, would not suffice to support a jury finding that contaminated water from Martin's plant had *probably* reached plaintiffs' taps in Friendly Hills over critical periods at levels sufficient to cause the injuries attributed thereto.

Nor was the Court below furnished satisfactory circumstantial evidence as to causation.[4] The etiological evidence[5] proffered by the plaintiff was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data.[6] *Lynch v. Merrell National Laboratories,* 830 F.2d 1190, 1194 (1st Cir. 1987); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1241 (E.D.N.Y.1985). At best, this circumstantial evidence supported only the conclusion that hydrazine causation was not inconsistent with the etiology of plaintiffs' injuries. This, the Court below correctly noted, is "useful only after plaintiffs have met their burden on the exposure issue by some other means." *Renaud,* 749 F.Supp. at 1554.

---

2. Plaintiffs presented no evidence of contaminated water flowing from their taps.

3. Dr. Miller, one of plaintiffs' experts, testified as to this at the hearing as follows:

Q. Doctor, this was a single sample taken in 1985, months after the Kassler galleries had closed; correct? This 160 part per million finding that you now say is the primary basis?
A. It was in the summer of '85, I believe, yes.
Q. Months after the galleries had closed; correct?
A. I think that's true.
Q. And you took this one value and you used that to represent the concentrations of hydrazines in the rinse water tanks for a period of 11 years prior; correct?
A. I took the best data that we had made available to me.
Q. Is the answer to my question yes?
A. Yes.

Tr., 7/11/90 at 532.

4. Plaintiffs' catalogue of circumstantial evidence claimed to have been disregarded by the Court below, opening brief at pp. 33–34, does not add up to a showing that it was "probable" that Martin's contaminants reached plaintiffs' taps "at levels sufficient to cause the injuries they have alleged." *Renaud,* 749 F.Supp. at 1555. The District Court did in fact address the more prominent of these items of evidence, observing that plaintiffs' own expert, Dr. Miller, acknowledged that the sources of hazardous waste at Waterton were unquantifiable. *Id.* at 1549.

5. Etiology is the cataloging of all of the known causes of a given disease.

6. Epidemiology, as applicable here, is the study of the pattern of incidence and distribution of disease in a defined population group.

Finally, as observed above, the plaintiffs, asserting that the Friendly Hills community was not large enough for such an epidemiological study to be meaningful,[7] submitted no such study as circumstantial evidence of causation.

Given the foregoing, the central issue on this appeal is the propriety of the District Court's observation regarding the single water sample used as a basis for plaintiffs' extrapolations: "Simply put, no one has any idea of whether this sample is representative of the 'normal' contaminant concentration." *Id.* at 1553.

We agree, ourselves observing that this would seem little more than common sense, and note that the District Court regarded her view as reinforced by the statement of Dr. Pavlik, the Court's own expert, at p. 6 of Dr. Pavlik's report to the Court: "It is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe continuous releases of contaminants over an 11-year period." [8]

In accordance with our holding in *Head v. Lithonia Corp., Inc.,* 881 F.2d 941 (10th Cir.1989), the District Court had an independent duty here to decide whether the single data point supported the admissibility of the conclusions plaintiffs' experts sought to draw therefrom. In so doing, the Court was required by Fed.R.Evid. 104(a) to make a preliminary determination concerning the qualifications of the plaintiffs' proposed witnesses and the admissibility of their testimony. This requirement applies also to experts, since pursuant to Fed.R.Evid. 703, the District Court has the responsibility of evaluating the trustworthiness of the factual basis upon which an expert witness relies and assessing "whether the particular underlying data was of a kind that is reasonably relied on by experts in the particular field in reaching conclusions ..." Weinstein's Evidence ¶ 703[03] at 703–16 (1982) (*cited in Head,* 881 F.2d at 944).[9]

This duty of assessment, we conclude, the District Court properly fulfilled in excluding as unsound the plaintiffs' experts' conclusions as to causation based on the single data point the record contained. Accordingly, on the best record on causation plaintiffs could adduce, there being no basis on which a reasonable juror could find that it was probable that the plaintiffs were exposed to Martin's Waterton contaminants, the order of the District Court granting summary judgment dismissing

---

7. We question, but leave for another day, the dicta of the Court below that a supporting epidemiological study was required here even had there been acceptable direct proof of exposure.

8. Plaintiffs in their brief at 39, while purporting to attack Dr. Pavlik's observation as being outside the scope of her role as advisor to the Court, in fact acknowledged the propriety of her service stating: "Under Fed.R.Evid. 702 and 703, court-appointed experts may comment on ... accepted methodologies...." This is exactly what Dr. Pavlik did. Next, in an unavailing effort to persuade that a single data point as was endeavored to be used here is reliable in the scientific community, plaintiffs point to such situations as Kassler and a Woburn, Massachusetts water supply facility both being promptly closed on the basis of a single sample *taken at the facility.* The difference is too obvious to warrant discussion.

Plaintiffs contend that the District Court erroneously denied them the right to take Dr. Pavlik's deposition. In this case, however, the experts were, as observed above, more technical advisors to the Court than expert witnesses as contemplated by Fed.R.Evid. 706, and accordingly depositions and cross-examination were inappropriate. *See Reilly v. United States,* 863 F.2d 149, 154–56 (1st Cir.1988); *Hemstreet v. Burrough Corp.,* 666 F.Supp. 1096, 1124 (N.D.Ill. 1987). Thus, the District Court did not abuse its discretion when it denied plaintiffs the discovery sought.

9. The observations of Circuit Judge Higginbotham in dissent in *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 884 F.2d 167 (5th Cir.1989), are particularly apt here:

This case [*Brock* ] raises important questions about the role of experts in the federal courts, including whether we should accept opinions of experts not based upon a generally accepted scientific principle.

\* \* \* \* \*

[T]he issue in this case revolves around the admissibility of the expert testimony. Indeed, we ought to be wary of opinions of scientists expressed in court free of their traditional restraints of peer review and scientific consensus.

*Brock* at 168–69.

the action as to both defendants is affirmed.